### PERRY v. MORRISON.

No. 16279—Opinion Filed April 20, 1926.

Rehearing Denied July 13, 1926.

### 1. Joint Adventures—Definition.

A joint adventure is a special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.

### 2. Same—Rights Inter Sese—How Determined.

P. and M. were appointed by written contract by L. his exclusive brokers for five days to sell an oil lease, their commission to be the excess derived above a stated price. Held, they engaged in a joint adventure and their rights, inter sese, are to be in.erred from the contract and their acts and conduct in relation to the engagement, under the law of partnership.

### 3. Same—Fiduciary Relation Requiring Utmost Good Faith.

The relation between the parties to a joint adventure is fiduciary in its character, and requires the utmost good faith in all the dealings of the parties with each other.

### 4. Same — Purchase of Property by Joint Adventurer for Individual Account.

Until the adventure has terminated or the enterprise has been abandoned, a joint adventurer cannot exclude his associates from an interest in the property by purchasing it for his individual account.

### 5. Same—Accounting to Associates Required of Purchaser.

If he does so purchase, in breach of his duty, or even for the purpose of carrying out the joint adventure, his payment for the property will be deemed to have been made for the benefit of the joint adventurers, and he will be compelled to account to his associates for any profits thus coming into his hands, adjusting costs and expenses.

### 6. Same—Right to Accounting for Broker's Commission Sustained.

Under the record, the joint adventure was not abandoned, and defendant is held as for accounting under the foregoing rules.

(Syllabus by Estes, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Hughes County; George C. Crump, Judge.

Action by A. F. Perry against R. W. Mor-

rison, Jr., for accounting of broker's commission. From a judgment for plaintiff for $100, plaintiff appeals. Reversed, with directions.

Anglin & Stephenson, for plaintiff in error.

Pryor, Stokes & Carver, for defendant in error.

Opinion by ESTES, C. Parties appear here as in the trial court. Perry sued Morrison on accounting for $1,000, one-half of broker's commission. The contract, dated July 27, 1923, provided in part that first party, Linker et ux., "does hereby appoint the second party (Perry and Morrison) the sole and exclusive agent and attorney to sell an oil and gas mining lease" on 40 acres, describing same, "the same to remain in the hands of the party of the second part for the period of five days. It is expressly agreed by the parties hereto that if a sale is effected during said period, then the said party of the second part is to have out of the proceeds of such sale as commission, all over and above the sum of $4,000 derived from said sale." Plaintiff alleged that he and defendant were to split such profits (corroborated by defendant's evidence infra); that plaintiff immediately took up the sale of such lease with the Atlantic Oil Producing Company of Tulsa, and on August 2, 1923, being the fifth day under said contract, closed negotiations for sale to that company for $6,000; that defendant procured the lease to be executed by Linker and wife to him. Morrison as grantee, and drew draft on said Atlantic Company, payable to himself through the Farmers National Bank of Holdenville, which was paid, and that defendant retained the entire $2,000 commission, one-half of which belonged to plaintiff.

It is clear that the written contract created the relation of principal and agent between the Linkers on the one hand and the plaintiff and defendant on the other, and not the relation of vendor and vendee. It was the theory of plaintiff that he and defendant thereby engaged in a joint adventure in the matter of the sale of the lease. Defendant denied that he agreed to divide profits, and alleged that he insisted on plaintiff raising the sum of $2,000, one-half of the purchase price, and that plaintiff could not and did not so do; that "defendant waited until ten minutes before the expiration of the time, and at all times held the proposition open for the said plaintiff to raise $2,000, * * * and was finally informed by plaintiff that it was impossible for him to raise the money"; and that plaintiff contributed nothing to the handling of the sale,

denying that plaintiff sold same as alleged in his petition, and denying plaintiff's right to any of the profits. It is inferable from the answer, that defendant himself purchased said lease by paying his own money therefor within the five days. The lease executed by the Linkers is not in evidence. Defendant Morrison testified that,

"The next day (July 28) I went down and got Mr. Linker and came back and had him execute the lease and put it in the bank, with draft for $4,000, and Mr. Pitts, a broker in Tulsa, called me up and told me he had sold it and would better hold it in this bank, which I agreed to do. We were making $2,-000. So Mr. Perry and I sent it up to Mr. Pitts in Tulsa, with four days draft for $8,-000. Mr. Pitts was making $2,000, and Mr. Perry and I making $2,000 between us, and the option not out, and Mr. Pitts called up the second or third day and said he had fallen down; Mr. Pitts said somebody up there sold it to somebody, Smith or somebody. Before four o'clock Friday, at which time the draft for $4,000 was due, and Mr. Linker had been in the bank for two hours several different times trying to take the lease down or get the money, and the bank wouldn't give it to him until four o'clock. That was Friday as the draft stated, and the last day, around two o'clock, some bank in Tulsa wired down here that the Atlantic Oil Producing Company would take that lease at $6,000, subject to approval of title. I told them Mr. Perry couldn't get up his half of the money. He couldn't do it or wouldn't do it. I even went so far as to go over then to the bank and indorse a note for $2,000 to help out and get that money and not let it go back, otherwise I would take it myself. * * * I took the lease out and put it on record, and went to St. Louis and left the assignment in the bank".

Defendant further testified that he incurred considerable expense in and about the sale. We take it that on July 28th defendant caused the lease to be executed by the Linkers to himself, as lessee, in order to facilitate the sale, and placed it in said bank with sight draft attached on that day. The record contains an assignment of the lease in due form, dated and acknowledged on August 4, 1923, by defendant, Morrison, to said Atlantic Oil Producing Company. Defendant also admitted that he thought he had the lease sold to Pitts. The Linkers testified that defendant stated to them that he had the lease sold at the time he procured same on July 28th. Plaintiff, Perry, testified that he negotiated sale of the lease on the fifth day to Atlantic Oil Producing Company, that is, "we contracted to sell it * * * within the time limit set by Linker * * * by purchase order from the company, Yes, sir, that is the customary way. * * * and if the

title was satisfactory to them when we got it examined, why, they were to take it"; that he told defendant of such sale on the fifth day. It appears also from the testimony of plaintiff and one Hayden, that the latter was a side partner of the plaintiff in the oil and gas business; that the day after the agency contract was signed, at the instance of plaintiff, Hayden went to Tulsa to sell this lease. Plaintiff and Hayden knew of the pending sale by defendant Morrison, to Pitts in Tulsa, and also learned before the expiration of the five days that the proposed sale to Pitts had failed. It is undisputed that Hayden procured said Atlantic Company, as purchaser, and that said company did thereafter pay defendant $6,000 for the lease. It seems defendant had sent the lease and abstract to Tulsa, and Hayden was unable to procure same to be delivered to the Atlantic Company before the expiration of the five days; that he did cause the Atlantic Company, through its bank, to send said telegram to the bank at Holdenville in the afternoon of the fifth day, as testified to by defendant, agreeing to purchase the lease for $6,000 on approval of title. Hayden was acting for and on behalf of plaintiff. It thus appears that the plaintiff and defendant each sought to sell said lease immediately upon procuring the contract from the Linkers; that defendant's prospective purchaser failed, but that said Atlantic Company, procured by plaintiff through Hayden, did finally consummate the purchase. The controversy is not between the vendors, the Linkers, and either of the two brokers, plaintiff and defendant, but between the two brokers thus jointly employed, for accounting of the commission. The contract, supra, provides that such commission would become due "if a sale is effected during said period". We are not called upon to construe this provision as between plaintiff and defendant. Whether they negotiated a sale within the time fixed by the contract, or effected a completed sale within that time, is not involved in the instant case. The Linkers accepted the $4,000 in pursuance of said contract, thus recognizing performance by defendant within the five days. This disposes of the contention made by defendant that the plaintiff, Perry, through his partner, Hayden, did not effect a completed sale within the five days.

Under defendant's own testimony, quoted above, the telegram from the Tulsa bank for the purchase of the lease was received by the Holdenville bank about two o'clock in the afternoon of the fifth day, and defendant, about ten minutes before four o'clock, the closing hour of the bank, claims to have purchased this lease for himself by making payment. Defendant admitted that he had not the money to purchase the lease, testifying that he borrowed part of same. While the evidence is that Linker demanded the cash or his lease on the fifth day, it is not clear whether he received the cash on the fifth day. He testified that he received it several days later. The record shows that defendant did assign the lease to the Atlantic Company on August 4th, about three days after the five-day period. Assuming that defendant did pay the entire $4,000 to the Linkers, or to their credit in the bank on the fifth day, which was several days before the Atlantic Company approved the title and remitted for the lease to the defendant, this would not constitute, under this record, an abandonment of the agency contract by both plaintiff and defendant, and the making of a new contract by defendant with the Linkers. If he did so pay in order to prevent the taking down of the lease by the Linkers, we suspect he did so relying upon the telegraphic offer or acceptance of said Atlantic Company.

The court found that the said agency contract "was abandoned by Mr. Perry and Mr. Morrison, and Mr. Morrison entered into a new contract with Linker, whereby he took the lease himself and paid him the sum of $4,000 of his own money. Mr. Perry refusing to pay anything, and Mr. Morrison * * * is entitled to the sum of $2,000 profit, less five per cent. commission for Mr. Perry and Mr. Hayden selling it". Thereupon, the court, without a jury, rendered judgment for plaintiff against defendant for $100. Plaintiff appeals, but defendant files no cross-appeal. The equity rule as to the quantum of evidence to support the judgment is applicable.

1. Under said agency contract, plaintiff and defendant engaged in a joint adventure.

"A joint adventure has been aptly defined as a special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation". 33 C. J. 841.

2. According to the contract and admissions and conduct of the parties, it was their intention to share equally in the profits of this enterprise. In Oklahoma Boiler & Welding Co. v. Minnetonka Lumber Co. et al., 103 Okla. 226, 229 Pac. 1045, the rule of joint adventure is that:

"The status may be inferred from the purpose of the enterprise, the acts and conduct of the parties in relation to the engagement. In some cases, the acts and conduct of the

parties may speak above the expressed declarations as to the creation of the undertaking and its scope."

In the sale of said lease, each of the agents so appointed acted for himself as principal and as agent for the other member of the adventure, and the law of partnership is applicable in the settlement of the question now raised between them. In the body of the opinion it is stated:

"After the parties have created and engaged in a joint enterprise, although it may relate to a single transaction, the law of partnership applies to questions arising between and among the parties, and in relation to third parties". Citing numerous authorities.

3. The $2,000 in the hands of defendant was acquired as a joint venture between plaintiff and defendant. The contention of defendant that the whole amount belongs to him, because plaintiff did not contribute to the purchase of the lease, is untenable as a violation of the fiduciary relation.

The relation between the parties of a joint adventure is fiduciary in its character, and requires the utmost good faith in all their dealings with each other. Dike et al. v. Martin et al., 85 Okla. 103, 204 Pac. 1106. Where property is acquired as a joint venture, it is not material in whose name the title is taken, as the one holding the title will be regarded as trustee for his associates. Cassidy v. Gould, 86 Okla. 217, 208 Pac. 780.

4. 6. Under the record, the joint adventurers did not abandon the enterprise. Said finding that plaintiff and defendant abandoned said agency contract and that defendant entered into a new contract with the Linkers, and the judgment based thereon, are clearly against the weight of the evidence. Defendant could not exclude plaintiff from his interest in the commission if plaintiff did purchase the lease. The Linkers were not aware of any new contract made by them with defendant as found by the court. In Dike et al. v. Martin et al., supra, it is stated:

"But the mere fact that the defendants paid the expenses, or furnished all the money used in prospecting the 'north 40' does not exclude the plaintiff from sharing in the proceeds", citing authorities.

"Until the adventure has terminated or the enterprise has been abandoned, a joint adventurer cannot exclude his associates from an interest in the property by purchasing it for his individual account. * * * If he does so purchase, in breach of his duty, he can be compelled by his associates to convey to them the interest in the property to which they were entitled upon their payment of their proportionate share of the cost." 33 C. J. 855.

Even though defendant did so pay part or all of the purchase price to the Linkers, such payment must be deemed to have been made for the benefit of the joint adventurers. See 5th paragraph of syllabus in the Dike Case, supra. Defendant should be held to an accounting and to pay plaintiff one-half of the $2,000, with interest, after adjusting any amounts due the parties for expenditures in the joint venture.

Let the judgment be reversed, and the cause remanded for further proceedings accordingly.

By the Court: It is so ordered.